UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------x

| | |
|---|---|
| Bar ALE, Inc., On Behalf Of Itself And All Others Similarly Situated, | Civil Action No. |
| Plaintiff, | CLASS ACTION COMPLAINT |
| v. | JURY TRIAL DEMANDED |
| PREMIER CHEMICALS, LLC; SUMITOMO CORPORATION OF AMERICA; and YAS, INC., | |
| Defendants. | |

------------------------------------------------------------x

## NATURE OF THE ACTION

1.      Plaintiff brings this lawsuit as a class action on behalf of all individuals and entities that purchased caustic-calcined magnesium oxide and/or dead-burned magnesium oxide (collectively "MgO") in the United States from defendants, their predecessors, subsidiaries, or co-conspirators from at least January 1, 2002 through the present (the "Class Period"). Plaintiff alleges that during the Class Period, defendants conspired to fix, raise, maintain, or stabilize prices for MgO sold in the U.S. and also allocated customers among themselves in violation of Section 1 of the Sherman Antitrust Act. As a result of defendants' unlawful conduct, Plaintiff and the Class members paid more for MgO than they would have absent defendants' illegal conduct.

## JURISDICTION AND VENUE

2.      Plaintiff brings this action pursuant to Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§15 and 26, to recover damages and costs of suit, including reasonable attorneys' fees, as the result of defendants' violation of §1 of the Sherman Act, 15 U.S.C. §1.

3. Subject-matter jurisdiction is proper pursuant to 28 U.S.C. §1337 and §§4 and 16 of the Clayton Act, 15 U.S.C. §§15 and 26.

4. Venue is proper in this district pursuant to 28 U.S.C. §1391(b) and (c) and §12 of the Clayton Act, 15 U.S.C. §22.

5. Defendant Sumitomo Corporation of America is incorporated and maintains its principal place of business in this district; all defendants transact business in this district; and Plaintiff's claims arose, in part, within this district. The interstate trade and commerce described herein was carried out, in part, within this district, and unlawful acts done in violation of the Sherman Act occurred within this district.

## PARTIES

6. Plaintiff Bar ALE, Inc., purchased MgO directly from one or more of the defendants during the Class Period.

7. Defendant Sumitomo Corporation of America ("Sumitomo") is a New York corporation with its principal place of business in New York, New York. During the Class Period, Sumitomo distributed and sold MgO in the U.S.

8. Defendant Premier Chemicals, LLC ("Premier") is a Delaware corporation with its principal place of business in Conshohocken, Pennsylvania. During the Class Period, Premier mined, manufactured, distributed, and sold MgO in the U.S.

9. Defendant YAS, Inc. ("YAS") maintains its principal place of business in Franklin Lakes, New Jersey. During the Class Period, YAS facilitated Sumitomo's sourcing of MgO from China for distribution and sale in the U.S.

## CO-CONSPIRATORS

10. Various other persons, firms or corporations not yet named as defendants in this lawsuit participated as co-conspirators with defendants in the offenses alleged and performed acts and made statements to advance these offenses.

## CLASS ACTION ALLEGATIONS

11. Plaintiff brings this action on behalf of itself and as a class action under Rule 23(a), 23(b)(2), and 23(b)(3) of the Federal Rules of Civil Procedure on behalf of the following class: .

> All persons and entities that purchased MgO in the U.S. directly from one or more of the defendants from at least January 1, 2002 to the present. Excluded from the Class are the defendants, their parent companies, subsidiaries, or affiliates.

12. Plaintiff does not know the exact size of the Class since this information is in the defendants' exclusive control. Based on the nature of the trade and commerce involved, however, Plaintiff believes the Class numbers at least in the thousands and that the members of the Class are geographically dispersed throughout the U.S. Therefore, joinder of all Class members would be impracticable.

13. Common questions of law and fact predominate among the Class members, including but not limited to:

   a.  whether defendants conspired to fix, raise, maintain, or stabilize the prices of MgO sold in the U.S.;

   b.  whether defendants conspired to allocate markets for MgO sold in the U.S.;

   c.  whether defendants' conduct caused injury to Plaintiff's and the class members' business or property and, if so, the appropriate classwide measure of damages; and

        d.        whether defendants took steps actively to conceal their conspiracy.

14.      These and other questions of law or fact predominate over any questions affecting only individual Class members.

15.      Plaintiff's claims are typical of the Class members' claims in that Plaintiff is a direct purchaser of MgO from one or more of the defendants; its purchases during the Class Period were typical of purchases by other Class members; and the relief Plaintiff seeks – monetary damages and injunctive relief – are common to the Class. In other words, the alleged conspiracy affected Plaintiff in the same way it affected each of the Class members.

16.      Plaintiff will fairly and adequately protect the Class members' interests in that Paintiff is a typical purchaser of MgO; has no conflict with any other members of the Class; and is represented by experienced and able antitrust class-action counsel. Plaintiff's interests are also coincident with and not antagonistic to the Class members' interests.

17.      Class action treatment is superior to any alternative for the fair and efficient adjudication of this case because Class treatment allows a large number of injured parties to prosecute their common claims in a single forum simultaneously and efficiently without duplicating evidence and effort. Class treatment permits the adjudication of claims by smaller Class members who could not afford to litigate individually an antitrust claim against large corporate defendants.

18.      Class certification is appropriate under Rule 23(b)(2) because defendants have acted on grounds generally applicable to Class members, thereby making appropriate final injunctive relief with respect to Class members as a whole.

**TRADE AND COMMERCE**

19.     Defendants mine, manufacture, distribute, and/or sell MgO either independently, as a subsidiary, or as part of a joint venture. MgO manufactured, distributed, and/or sold by one defendant is fungible, as it is comparable to and interchangeable with MgO manufactured, distributed, and/or sold by the other defendants.

20.     During the Class Period, defendants sold MgO in a continuous and uninterrupted flow of interstate commerce to customers located in states other than the states in which defendants mined or otherwise originally acquired MgO. Thus, defendants' business activities with respect to MgO were within the flow of, and substantially affected by, interstate trade and commerce.

**FACTS**

*MgO*

21.     MgO is a solid, white, naturally occurring material. It is formed by an ionic bond between one magnesium atom and one oxygen atom.

22.     MgO is used in a wide variety of industrial applications, including the production of refractory products, animal feeds, fertilizers, pharmaceuticals, food products, electrical insulation, and flame-retardant materials, among other things.

23.     MgO can be mined from magnesite, or it can be processed from seawater or subterranean brines containing magnesium chloride. The two most common forms of MgO are caustic-calcined magnesia ("Caustic MgO") and dead-burned magnesia ("Dead-Burned MgO"). Caustic MgO is manufactured at lower temperatures than Dead-Burned MgO and is used in products such as animal feed and fertilizers that do not require the reduced reactivity offered by Dead-Burned MgO. Dead-Burned MgO is most often used in refractory applications.

24.     The MgO industry has a number of structural and other characteristics that facilitate the implementation and maintenance of a horizontal price-fixing conspiracy, and demonstrate that all MgO purchasers were impacted by the conspiracy. These characteristics include:

   a.     MgO is a commodity product that is fungible in that MgO manufactured by any defendant is readily substitutable for MgO manufactured by any other defendant. MgO is a highly homogenous product sold by defendants and purchased by Plaintiff and members of the Class primarily on the basis of price. It is easier to form and sustain a cartel when the product in question is a commodity because it is easier to agree on prices to charge and to monitor those prices once an agreement is formed.

   b.     Defendants sold or had the ability to sell MgO of comparable type and quality throughout the U.S. in overlapping geographic markets.

   c.     The MgO industry in the U.S. is highly concentrated, facilitating coordination of MgO prices among defendants. During the class period, defendants had market power over the sale of MgO in the U.S.

   d.     There are substantial barriers to entry in the MgO industry. Entry into the industry requires a substantial sunk investment and a significant period of time. The minimum viable scale of a new MgO production facility is very large and extremely costly. Similarly, viable entry requires that the new producer capture a significant market share from existing producers. Thus, entry is both expensive and risky.

   e.     The demand for MgO was and is inelastic.

### *The MgO Market*

25.     In 2000, Premier controlled the majority of domestically consumed Caustic and Dead-Burned MgO. In 2000, domestic production contributed to approximately 50% of the total U.S. consumption of Caustic MgO and a lesser amount of Dead-Burned MgO with the rest coming mostly from China, which Premier purchased for resale to its U.S. customers. Sumitomo similarly purchased Chinese MgO but only Dead-Burned MgO for resale to its U.S. customers. Premier and Sumitomo also sourced magnesite from China for manufacture into Dead-Burned MgO for sale in the U.S. YAS facilitated Sumitomo's purchases of Chinese magnesite due to YAS's relationships with the Chinese magnesite mines.

26.     Preceding the Class Period, Premier saw its share of the MgO markets shrink due to increased Chinese competition.

27.     For instance, in the 1980s the U.S. was a net exporter with respect to Dead-Burned MgO. Since then, however, cheaper imports, mainly from China, have replaced some of the U.S. domestic production, notably affecting Premier. During the Class Period, Premier and Sumitomo bought virtually all the Chinese Dead-Burned MgO available for purchase and resold it to their U.S. customers.

28.     During the Class Period, with some limited exceptions, the MgO markets were considered to be fairly saturated, with limited potential for growth.

### *The MgO Price-Fixing Conspiracy*

29.     Instead of competing, as early as the beginning of 2002, representatives from Premier, Sumitomo, and YAS began meeting regularly to discuss fixing U.S. MgO prices and allocating U.S. MgO markets.

7

30. Sumitomo, facilitated by YAS, imports MgO from China in the U.S. YAS has relationships with various Chinese magnesite mines. YAS's relationships with these Chinese mines allow Sumitomo to make MgO purchases from these mines for resale in the U.S. In particular, Sumitomo purchases MgO from Chinese mines, which purchases are and have been facilitated by YAS, thereby allowing Sumitomo and YAS to participate together in the U.S. MgO market.

31. Premier is also active in the U.S. MgO market. Premier regularly communicated with YAS to discuss fixing Premier's and Sumitomo's Dead-Burned MgO prices and allocating their respective MgO accounts in the U.S.

32. Beginning in 2004, Sumitomo was looking for ways to increase the amount of MgO is was transporting from its facility in New Orleans. Specifically, it wanted to move Caustic MgO feed grade from New Orleans to Tulsa by barge, and also to move Dead-Burned MgO by barge on the Ohio River to steel factories in Ohio and Pennsylvania. Sumitomo's New Orleans barge capacity of approximately 17,000 metric tons was only being 50% utilized with Dead-Burned MgO. Premier and Sumitomo had by this time regularly communicated about fixing Dead-Burned MgO prices and allocating customers. Sumitomo nonetheless was faced with a dilemma, as it wanted to fully utilize its barge capacity by entering the feed grain (Caustic MgO) segment of the market while at the same time not upsetting its price-fixing arrangement with Premier. Tulsa was the only port which could accommodate the barge size used by Sumitomo, where it also had access to a very large storage facility.

33. Further to Sumitomo's desire to expand its markets, a meeting occurred at the Holiday Inn in Tulsa in the summer of 2004. Attendees included a broker who represented Premier's account (Vannorsdel, who was present with his son), one current (Akiyama) and one

8

former executive of Sumitomo, who was the then current president of YAS (Sumikawa), who had a background in marketing and connections to Chinese MgO mines. Premier's MgO product was a blend of raw materials coming from its U.S. mines and raw materials coming from its Chinese mines. The broker was concerned about jeopardizing his relationship with Premier by being engaged in discussions with Sumitomo, but was told by the Sumitomo executive, "not to be concerned because we (Sumitomo) talk with Premier on a daily basis to set prices and to discuss what accounts they can have."

## FRAUDULENT CONCEALMENT

34.     Defendants engaged in a successful, unlawful price-fixing conspiracy which, by its very nature, was inherently self-concealing.

35.     As a result, until recently neither Plaintiff nor the Class members had knowledge of any of the foregoing violations, and neither Plaintiff nor the Class members, until recently, could have discovered through reasonable diligence that defendants and their co-conspirators had engaged in the foregoing violations, since defendants and their co-conspirators actively and fraudulently concealed these violations to obscure their illegal activity.

36.     For example, as set forth above, defendants met secretly and amongst themselves for the express purpose of fixing prices and allocating markets of domestically sold MgO.

37.     During the Class Period, price increases for MgO were justified by references to tight supply, thinning margins, and increased energy and freight costs. Defendants used these rationales to explain price increases instead of disclosing that such increases were the intended result of a conspiracy to fix prices and allocate markets.

38.     Defendants and their co-conspirators wrongfully concealed and carried out their illegal conduct in a manner that was designed to and did preclude detection.

9

39. Defendants and their co-conspirators' fraudulent concealment tolled the statute of limitations applicable to Plaintiff's and the Class members' claims.

## EFFECTS/DAMAGES

40. Throughout the Class Period, Plaintiff and the class members purchased MgO from one or more of the defendants, their subsidiaries, affiliates, and/or co-conspirators.

41. Defendants' contract, combination, and conspiracy had the following effects, among others:

    a. defendants and their co-conspirators maintained MgO prices charged to Plaintiff and the Class members at artificially high and non-competitive levels;

    b. Plaintiff and the Class members were deprived of free and open competition in the purchase of MgO; and

    c. competition in the sale of MgO was unreasonably restrained.

42. As a direct and proximate result of defendants' and their co-conspirators unlawful contract, combination, and conspiracy, Plaintiff and the Class members were injured and financially damaged in their businesses and property by having paid more for MgO than they would have absent defendants' and their co-conspirators' unlawful activities. The total amount of damages is presently undetermined.

## COUNT I
### Violation of the Sherman Act, 15 U.S.C. §1

43. Beginning as early as January 2002 and continuing through the present, defendants and their co-conspirators entered into and participated in a combination and conspiracy to suppress and eliminate competition by fixing the prices of MgO sold in the U.S. This combination and conspiracy, which consisted of a continuing agreement, understanding, and concert of action to raise, fix, and maintain the prices for the sale of MgO throughout the

U.S. and elsewhere, was an unreasonable restraint of trade and commerce in violation of §1 of the Sherman Act, 15 U.S.C. §1.

44. To form and implement their combination and conspiracy, defendants and their co-conspirators via meetings and other communications, combined and conspired to do the following things, among others:

    a. exchanged information on prices charged for MgO sold domestically;

    b. agreed to raise, fix, and maintain prices for MgO sold domestically;

    c. raised, fixed, and maintained prices for MgO sold domestically;

    d. allocated markets for MgO, and

    e. sold MgO throughout the U.S. at non-competitive prices.

45. Defendants and their co-conspirators engaged in the foregoing activities in furtherance of their conspiracy and for the purpose of effectuating their unlawful contract, combination, and conspiracy. Defendants and their co-conspirators are jointly and severally liable for all damages caused by their conspiracy.

46. As a direct and proximate result of defendants' unlawful conduct, Plaintiff and the Class members were injured by having paid more for MgO than they otherwise would have paid absent defendants' unlawful conduct.

## JURY DEMAND

47. Plaintiff demands a jury trial.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff seeks the following relief:

    a. That the Court certify this action as a class action under Rule 23(b)(2) and (3) of the Federal Rules of Civil Procedure;

b.  That the Court declare defendants' contract, combination, and conspiracy to have violated §1 of the Sherman Act, which violation injured Plaintiff and the Class members in their businesses and property;

c.  That the Court enter judgment for Plaintiff and the Class members against defendants for treble damages, costs, and reasonable attorneys' fees;

d.  That the Court permanently enjoin defendants from continuing the illegal conduct alleged; and

e.  That the Court grant Plaintiff and Class members such other relief as it may deem just and proper.

Dated: September 29, 2010

COHEN MILSTEIN SELLERS & TOLL, PLLC

By: *(signature)*
J. Douglas Richards
Seth R. Gassman
88 Pine Street, 14th Floor
New York, NY 10005
Telephone: (212) 838-7797
Facsimile: (212) 838-7745

GOLD BENNETT CERA & SIDENER LLP
Solomon B. Cera
Thomas C. Bright
C. Andrew Dirksen
595 Market Street, Suite 2300
San Francisco, California 94105
Telephone: (415) 777-2230
Facsimile: (415) 777-5189

COHEN MILSTEIN SELLERS & TOLL, PLLC
Benjamin D. Brown
Kit A. Pierson
1100 New York Ave. NW, Suite 500 West
Washington, DC 20005
Telephone: (202) 408-4600
Facsimile: (202) 408-4699

Attorneys for Plaintiff and the Class